IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MELINDA RIDDICK** | * | |
| | * | |
| v. | * | Civil No. JKS 09-33 |
| | * | |
| **MAIC, INC.** | * | |

## MEMORANDUM OPINION

Plaintiff Melinda Riddick (Riddick) filed this action against her employer, Defendant MAIC, Inc. (MAIC), pursuant to the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), under Title VII of the Civil Rights Act. ECF No. 1. Pursuant to consent of the parties, this case was referred to me for all further proceedings. ECF No. 23. Presently pending is Defendant's motion for summary judgment. ECF No. 36. No hearing is deemed necessary. *See* Local Rule 105.6. For the reasons set forth below, Defendant's motion for summary judgment will be granted.

**I.     Background.**

The following facts are either undisputed or are construed in the light most favorable to Riddick. Riddick was hired by MAIC in October 2007. She served as a project manager and her responsibilities included managing projects, interfacing with clients, handling onsite responsibilities, and supervising nine to eleven employees. ECF No. 41, Ex. A at 63-64, 139, 233; *id.*, Ex. B at 26. She worked directly under Mozelle Awkward, Vice-President of MAIC, Veronica Mathews, Director of Human Resources, and Rita Henderson, President of MAIC. *Id.*, Ex. A at 53-55. She also worked alongside Robert Weiss, who was involved with the company for many years. *Id.*, Ex. A at 72–75.

During most of her tenure at MAIC, Riddick received praise from clients and her superiors. *Id.*, Ex. A at 65–69, 196–209; *id.*, Ex. D. Nevertheless, she was very stressed while

working at MAIC. *Id.*, Ex. A at 42–47. Her superiors would constantly tell her conflicting information, and there was a conflict as to whether Awkward or Henderson was her direct supervisor. *Id.,* Ex. A at 47–55. She also felt she was regularly undermined in front of her employees. Specifically, she would tell her employees one thing and then Weiss "would come in and totally try and turn that around, undermine [her], tell [her] team something totally different which became very confusing to [the] team." *Id.*, Ex. A at 80. In April 2008, Riddick learned that she was pregnant, *id.,* Ex. A at 95, and around May 13, 2008, she notified MAIC of her pregnancy. ECF No. 41 at 7; *id*., Ex. B at 56; *id*., Ex. C ¶ 19.

Henderson began expressing concerns with Riddick's work by March 2008. ECF No. 44, Ex. 1-4. She began learning of performance concerns that Weiss and Riddick's team had with Riddick in early April 2008. ECF No. 41, Ex. B at 77–78; ECF No. 44 at Ex. 5-9. On April 23, 2008, Henderson asked Riddick to set up a meeting to discuss these concerns, but the parties were unable to meet before the middle of May when Riddick's doctor put her on four weeks of bed rest. ECF No. 41, Ex. A at 111–13. When Riddick informed Henderson of her doctor's request, Henderson told Riddick to make sure she got the recommended rest, *id.,* Ex. A at 113, 163–64, and had individual meetings with Riddick's team. *Id.*, Ex. B. at 78.

While Riddick was on bed rest, Lafon King, Riddick's "back up," temporarily took over as Project Manager. *Id.*, Ex. A at 114–16. Riddick believed that King and Henderson would keep her up to date on the project. *Id.*, Ex. A at 118–20. However, Riddick lost contact with MAIC and at one point was reprimanded by Henderson after calling King about the project. *Id.*, Ex. A at 122–24.

On June 16, 2008, the day Riddick reported back from her medical leave, Henderson fired her. Riddick was not given an explanation for her termination, but Henderson told her that

she was not fired for performance reasons. *Id.,* Ex. A at 176–77. Riddick believes that she was fired because she was pregnant, and believes that King was given her job because King is unable to have children. *Id.*, Ex. A at 137. On June 19 and June 24, Riddick filed charges of discrimination with the Prince George's County Office of Human Rights and the United States Equal Employment Opportunity Commission, respectively. After waiting more than 180 days to receive the EEOC right-to-sue letter, Riddick filed this complaint. MAIC now moves for summary judgment. ECF No. 36.

## II. Standard of Review.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Pulliam Invest. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). A moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting the burden of raising a genuine issue of fact by substantial evidence to the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A party who will have the burden of proof at trial, on the other hand, must make a showing sufficient to establish the existence of the essential elements of its claim or defense. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Peters v. Jenney*, 327 F.3d

307, 314 (4th Cir. 2003). To defeat the motion, the party opposing summary judgment must submit evidentiary materials showing facts on the basis of which the finder of fact could reasonably decide the case in its favor. *Anderson*, 477 U.S. at 252. If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Id.*

**III.    Discussion.**

Title VII provides that an employer shall not "fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978 extended the scope of discrimination based on sex to include discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Thus, a pregnancy discrimination claim is "analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998). A plaintiff may establish her claim "through direct or circumstantial evidence" that her pregnancy "motivated the employer's adverse employment decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).

Riddick has not provided any direct evidence that her pregnancy motivated MAIC's decision to terminate her. As a result, the court must evaluate her discrimination claim under the *McDonnell Douglas* burden-shifting analysis for circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Riddick has the initial burden of establishing a prima facie case of discrimination. *Id.* at 802. Once she has met this initial burden, the burden shifts to MAIC "to articulate some legitimate, nondiscriminatory reason" for the termination. *Id.*; *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000). If MAIC

4

meets this burden, Riddick is "afforded the opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *Id.* at 143.

A.  **Riddick's Prima Facie Case of Employment Discrimination.**

To satisfy her initial burden, Riddick must establish each of the four elements of a prima facie case by a preponderance of the evidence. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006). Specifically, she must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was performing her job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) her position remained open or was filled by a similarly qualified applicant outside the protected class. *Baqui v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006) (citing *Hill*, 354 F.3d at 285). The parties do not dispute that Riddick was pregnant at the time she was terminated and that her position was filled by a similarly qualified applicant outside the protected class. They do, however, disagree as to whether she was performing her job duties at a level that met MAIC's legitimate expectations.

In support of her claim that she was meeting expectations, Riddick argues that "Defendant never expressed to [her] that she was failing to meet Defendant's expectations and, instead . . . praised Plaintiff's work performance on numerous occasions." ECF No. 41 at 7. As evidence, she submits her own deposition testimony that she received praise from supervisors, Henderson's deposition testimony that she did not question Riddick's performance during the first 90 days and knew that clients were pleased with Riddick's work, and five emails, two from Henderson and three from Weiss. ECF No. 41 at 7–11. In response, MAIC points to Henderson's testimony that she had no cause to criticize Riddick's work during the first 90 days because Riddick did not begin performing her actual position until after that time, but that as

5

soon as Riddick began to submit written work, Henderson became aware, and communicated to Riddick, that Riddick's products could not be given to clients. Riddick's writing had to be revised and rewritten; writing was "challenging" for Riddick. *Id.,* Ex. B at 12, 68. In addition, the clients who were pleased with Riddick's projects did not receive Riddick's own work, *id.,* Ex. B at 50, and Weiss made Henderson aware of other problems with Riddick's performance in early April. *Id.,* Ex. B. at 108. Finally, Riddick was responsible for inputting data into a crucial database which was discovered to have problems in early April. Henderson repeatedly discussed with Riddick the importance of accurate data input, and Riddick "tremendously fell short on that." *Id.,* Ex. B at 81-82, 87.[1] Finally, Henderson testified that every employee who worked under Riddick on a particular project had complained about Riddick's relations with others, responsiveness, and management style. *Id.,* Ex. B at 82-83.

Prior to Riddick's leave of absence, Henderson attempted without success to meet with Riddick about her current project. When Henderson finally met with Riddick's team about the project after Riddick was on leave, Henderson received "a chorus" of complaints, began to meet with employees individually, and eventually realized that the problems were insurmountable and that Riddick would have to go. *Id.,* Ex. B at 78-80. Henderson's testimony is corroborated by numerous affidavits from Riddick's co-workers detailing her poor leadership performance. ECF No. 36, Exs. 2, 3, 10-16. The employees complained that Riddick talked negatively about people behind their backs, favored certain employees, did not answer questions, was irritating to work with, and was overall incapable of performing her position. *Id.*

---

[1] Riddick's testimony that another employee was responsible for the computer problems does not undermine Henderson's testimony regarding this issue. Courts do not weigh the prudence of employer personnel, business, and organizational decisions. *Rowe v. Marley,* 223 F.3d 825, 831 (4th Cir. 2000), or substitute their judgment for that of the employer. *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 298-99 (4th Cir. 1998).

When assessing whether a plaintiff has met her employer's legitimate expectations, a court must examine the plaintiff's evidence independent of the nondiscriminatory reason for the plaintiff's termination produced by the defense. *Glunt v. GES Exposition Serv., Inc.*, 123 F. Supp. 2d 847, 865 (D. Md. 2000) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000)). An employee's self-assessment is not probative to establish a genuine issue of fact as to whether the employer's standards were met; instead, the employee must submit corroborating evidence of what the employer's expectations were and whether she met them. *See Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 960-61 (4th Cir. 1996); *see also Warch*, 435 F.3d at 518 (finding that the opinions offered by third parties who were never employed by the defendant lacked probative value); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (explaining that coworkers' opinions are not relevant where they fail to establish the employer's expectations and whether the plaintiff met them). The plaintiff's burden, however, is not meant to be prohibitive or onerous and should not be applied too strictly for fear of dismissing an otherwise meritorious claim. *Warch*, 435 F.3d at 515-16.

Riddick has not presented sufficient evidence to create a genuine issue of fact as to whether she met MAIC's legitimate performance expectations prior to her termination. First, Riddick's self-serving deposition testimony is not sufficient without corroborating evidence. *See King*, 328 F.3d at 149. Henderson's lack of criticism during Riddick's first 90 days is not significant because Riddick was not expected to perform during that time. The emails Riddick cites are similarly not probative as to Riddick's overall performance as a project manager. The March 27th, April 2nd and April 3rd emails compliment Riddick's meeting with one client and submission of one team report. The May 8th email praises the work of Riddick's team in general

7

and goes on to discuss numerous specific areas which Riddick needed to address. None of these emails addresses Riddick's overall performance as a project manager. ECF No. 41, Ex. D.

Riddick's evidence falls short of that presented in the cases upon which she relies. In *Glunt*, the plaintiff satisfied her "minimal burden" of showing satisfactory performance by showing that she received outstanding performance reviews. 123 F. Supp. 2d at 865. In addition, the defendants in *Glunt* acknowledged that the ultimate performance indicator was a show's success, and the plaintiff provided evidence that the show she was fired for had performed well and been well received. 123 F. Supp. 2d at 865. Similarly, in *Huang v. Gutierrez*, No. 08-2882, 1010 WL 93274 at \*6 (D. Md.) (Jan. 5, 2010) (unreported), the court noted the absence of any allegation that the terminated employee committed any egregious violations of the employer's expectations, and found that two warnings and one faulty performance allegation on a particular project did not overcome plaintiff's rebuttal evidence, which included the employer's admission that other employees were not terminated for similar deficiencies. *Id*. at \*7. In contrast, and similarly to this case, the plaintiff in *Warch* did not create a genuine dispute by showing isolated instances of above average performance because the defendant had provided considerable evidence of the plaintiff's repeated failures and negative performance. 435 F.3d at 517-18. Here, as in *Warch*, Riddick has failed to establish a prima facie case of pregnancy discrimination.

**B.**     **MAIC's Legitimate, Nondiscriminatory Reason.**

If it is assumed that Riddick established a *prima facie* case of employment discrimination, the burden would shift to MAIC to articulate a nondiscriminatory reason for Riddick's termination. The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d

513-14 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The employer "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *Rowe v. Mass Transit Admin.* 303 F. Supp 2d 596, 608 (D. Md. 2003) (quoting *E.E.O.C. v. Western Electric Co., Inc.*, 955 F.2d 936, 941 (4th Cir. 1992)).

MAIC contends that Riddick was fired because of various performance deficiencies it learned about before and during the time when Riddick was on bed rest. As previously discussed, Henderson began to have concerns in March, and in April tried to meet with Riddick, Weiss, and individual members of Riddick's team to discuss some of these concerns. ECF No. 41, Ex. B at 77–78. When the group could not find a time to meet before Riddick went on her four week bed rest, Henderson met with Riddick's team members, learned about more serious problems with Riddick, and decided that the only option was to terminate Riddick. *Id.*, Ex. B at 78-79.[2]

As noted, numerous employee affidavits corroborate Henderson's testimony. MAIC also presented evidence of several instances when it allowed employees to take maternity and other medical leave. ECF No. 36, Ex. 19.[3] This evidence satisfies MAIC's burden of producing evidence of a legitimate nondiscriminatory reason for Riddick's termination.

Once MAIC articulates a non-discriminatory reason for Riddick's termination, the burden shifts back to Riddick to show that MAIC's explanation is a pretext for unlawful discrimination. *Obi v. Anne Arundel County*, 142 F. Supp. 2d 655, 664 (D. Md. 2001) (citing *Reeves*, 530 U.S. at 147). When reviewing an employer's proffered reason for a plaintiff's

---

[2] Henderson considered demoting Riddick, but felt that the demotion would insult Riddick and that her performance problems were so severe that she could not overcome them. ECF No. 36, Ex. 1 at 80-82.

[3] Four of MAIC's current employees have submitted affidavits stating that MAIC allowed them to take a medical leave of absence to have children. *Id.*, Exs. 6-9.

termination and a plaintiff's corresponding claim of pretext, the court must "keep in mind that Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) (quoting *Jiminez v. Mary Washington College*, 57 F.3d 369, 377 (4th Cir. 1995)). The court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions." *Id.* at 299 (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Thus, the court does not have the duty to decide whether the defendant's articulated nondiscriminatory reason for the plaintiff's termination "was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination." *Id.* (quoting *Giannopoulos*, 109 F.3d at 410-11). Rather, the plaintiff must present sufficient evidence to enable a factfinder to reject the employer's non-discriminatory explanation. *Reeves*, 530 U.S. at 142; *Rowe v. Marley,* 233 F.3d 825, 830 (4th Cir. 2000).

Riddick focuses on the alleged temporal proximity between MAIC's changed perception of her job performance and MAIC's discovery of her pregnancy as evidence that MAIC's proffered reason was merely pretext. The proximal timing of the termination and the alleged onset of poor performance can help create an inference that the defendant's explanation is a pretext for unlawful discrimination. *See Glunt v. GES Exposition Services, Inc.*, 123 F. Supp. 2d 847, 867, 872 (D. Md. 2000) (holding that plaintiff has created a reasonable inference of discrimination due to the timing of the plaintiff's perceived decline in performance and the accompanying angry and cold remarks relating to the plaintiff's pregnancy); *EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 834 (6th Cir. 1997) ("[T]he issuance of . . . [the] first unfavorable evaluation shortly after [the plaintiff] notified her superiors of her pregnancy" supports a finding that the explanation of corporate restructuring was a pretext for

10

discrimination.") (internal quotations omitted). Timing, however, is merely a factor, and alone is not sufficient to establish pretext. *See Williams v. Cerberonics*, 871 F.2d 452 (4th Cir. 1989) (holding that the employer's knowledge that an employee engaged in a protected activity immediately prior to the employee's termination is insufficient to counter substantial evidence of legitimate reasons); *Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 397 (D. Md. 2004) (holding that temporal proximity does not establish pretext in the face of a strong legitimate non-discriminatory reason for the plaintiff's termination); *see also Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001) ("[T]he combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment.").

As noted, the perception of poor performance preceded Riddick's pregnancy and leave announcements. Riddick does not dispute that MAIC first learned of Riddick's pregnancy after Henderson noticed problems and after Weiss shared his concerns with Henderson. However, Riddick would not be able to establish pretext even if her pregnancy announcement had preceded MAIC's perception of poor performance, because timing alone is not sufficient and Riddick does not submit any other evidence to support an inference that the allegations of her performance deficiencies are false. Her contention that they are "not credible" is not evidence of falsity. Riddick thus is unable to establish the allegations of her poor performance are mere pretext for pregnancy discrimination.

**V.    Conclusion.**

For the foregoing reasons, Defendant's motion for summary judgment will be granted.

 _November 23, 2010_                                           _____/S/_____
      Date                                                            JILLYN K. SCHULZE
                                                                   United States Magistrate Judge